UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VERONICA ADAMSON,

     Plaintiff,

                                    Case No. 22-cv-12611

v.                                Honorable Linda V. Parker

CITY OF TAYLOR, et al.,

     Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On October 31, 2022 Veronica Adamson ("Adamson") filed this lawsuit against the City of Taylor ("Taylor") for *Monell* constitutional deprivations as the result of constitutional violations by Taylor Police Department ("TPD") officers Thomas Amross, Jordan Chamberlain, Anna Marie Lumetta, Aaron Layne, Andrew Sylvester, Josh Fryckland, and Brent Studer (collectively the "defendant officers").[1]  Specifically, Adamson alleges that the individual defendants violated her rights under the United States Constitution by committing  an unconstitutional search and seizure, using excessive force, and engaging in malicious prosecution.

---

[1] Officer Studer was initially erroneously named as "Officer Struder," but this error was address via stipulated order on February 9, 2023.  (ECF NO. 29)  Since the filing of this suit, Officer Lumetta's last name has changed to Eddings.  For clarity, she is referred to as Lumetta.

Presently before the Court is Defendants' motion for summary judgment. The motion is fully briefed.  (ECF Nos. 41, 43, 44.)  Finding the facts and legal arguments sufficiently presented in the parties' briefs, the Court dispensed with oral argument pursuant to Local Rule 7.1(f).  For the reasons that follow, Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

## I.   Background

On December 1, 2019, Adamson lived at 16384 Jackson Street in Taylor, Michigan with her 10 year-old son and her cousin.  The evidence presented in support of summary judgment includes: (1) depositions of Taylor Police Officers Amross, Chamberlain, Fryckland, Lumetta, and Layne; (2) Adamson's deposition; (3) 911 audio tapes; (4) police reports from the incident in question; (4) Taylor body worn camera ("bodycam") video from Officer Fryckland; (5) still photos from bodycam footage from Officers Fryckland and Lumetta; (6) a weather report; and (7) a transcript of an evidentiary hearing held in Michigan state court. Viewing the evidence in the light most favorable to Adamson, properly weighing the video evidence, the facts are as follows.

At  03:59:12 a.m. on December 1, 2019, an individual who identified himself as Adamson's stepfather reported that Adamson had assaulted the father of her child, Jerry Jennison, with a pistol while she was in the City of Romulus, stolen

Jennison's dog, was possibly intoxicated, and was heading for the City of Taylor where she lived with her ten-year-old child.  (ECF No. 41-5, PageID.221, Dispatch Tape 03:59:12.)

### a. Dispatch Calls

At 4:13:21, a Taylor dispatcher informed all cars that Adamson was "high on drugs, she has a handgun on her and her 10 year-old son with her at that address." (ECF No. 41-6.)  Jennison then called the Taylor police department at 4:20:50 and spoke with Lieutenant Hill, a Taylor officer.  On the call, Jennison stated he was at his home and Romulus police were present.  Jennison put Romulus police Corporal Otter on the phone with Lieutenant Hill.  (ECF No. 41-7.)  Hill asked if Adamson was "good for any of [Romulus police's] charges, or no?"  And Otter responded "Yeah, yeah."  (*Id.*)

At timestamp 4:23:45, a Taylor dispatch call went out which stated "Cars on Jackson. If you guys make contact with her, she is good to go for Romulus. She is armed with a silver handgun."  (ECF No. 41-8.)  Shortly thereafter, at timestamp 4:24:50, a Taylor dispatch call went out which stated "Cars on Jackson. Sounds like she FA'd a male there in Romulus and stole his dog."  (ECF No. 41-9.)

Bodycam footage of the arrest begins at timestamp 9:12:38Z, with officers first knocking on Adamson's door at timestamp 09:13:00-09:13:57 (04:13:00-

04:13:57 EST).[2] (ECF No. 41-13, PageID.256; Fryckland BWC.)  Adamson

alleges that the dispatch calls cannot have been received prior to her arrest due to

the timestamps.

The Court acknowledges and credits the discrepancy between the

timestamps on the dispatch calls and the bodycam footage.  However, the officers

at the scene universally confirmed that prior to arriving at Adamson's house, they

were informed by dispatch that: (1) Adamson had committed a felonious assault in

Romulus; (2) there was probable cause to arrest her; (3) Adamson was likely

intoxicated or high; (4) was armed with a firearm; and (5) there was a child in her

home.  (ECF No. 43-3, PageID.383–384; ECF No. 43-4, PageID.396, 400; ECF

No. 43-5, PageID.416, 419; ECF No. 43-6, PageID.434, 438, 440; ECF No. 43-7,

PageID.456, 458; ECF No.43-8, PageID.467.)  In addition to the testimony of the

officers on the scene, the contested dispatch calls are audible at the beginning of

the bodycam footage at timestamps 09:12:40 and 09:13:42 (4:12:40 and 4:13:42,

respectively).

Adamson suggests that the bodycam footage may be "doctored."  (ECF No.

43, PageID.322–324.)  Defendants respond that the dispatch calls and bodycams

---

[2] The Court notes that timestamps on the Taylor bodycam footage are in "Zulu" time, which is
five hours ahead of Eastern Standard Time. For the sake of clarity, the Court has included
conversions of all timestamps to Eastern Standard Time for the purposes of this Opinion and
Order.

were simply not synchronized or calibrated, so the time stamps do not match perfectly.  (ECF No. 44, PageID.554.)  The discrepancy in the timestamps with the dispatch calls is the sole piece of evidence that there has been any alteration to the bodycam footage.

The Court also notes that the only information which was first relayed in the dispatch call at issue is that Adamson was "good to go" – which Defendants allege means there was probable cause for her arrest for the assault in Romulus – at the time of the arrest.  It is uncontested that the 4:13:21 dispatch call occurred prior to the arrest, which informed Taylor officers that Adamson had "pulled a gun" on someone, was possibly high, and had a handgun and a child with her.

The Court finds that viewing the evidence in the light most favorable to Adamson, no reasonable jury could find that the bodycam footage was doctored solely based on the discrepancy in the timestamps, given the fact that the calls are audible in the beginning of the bodycam footage and there is no indication that the bodycam footage was edited in any way.  Consequently, based on the bodycam footage and consistent testimony of the officers at the scene, the Court finds that there is no genuine dispute of material fact and the officers received all the relevant dispatch calls prior to Adamson's arrest.

   **b.  The Arrest**

At approximately 4:10:18 a.m., the defendant officers arrived at Adamson's home and noticed nothing out of the ordinary. (ECF No. 41-13, Fryckland BWC 09:10:18-09:13:00; ECF Nos. 41-15–41-19.) There was no screaming, signs of a struggle, or other disturbance. (ECF No. 41-13.) It is unclear if the officers on the scene knew what time the assault in Romulus had occurred, but it is uncontested that Taylor police did not have a warrant for Adamson's arrest. The entirety of the arrest was captured by Officer Fryckland's bodycam.

Officer Amross stood on Adamson's porch and banged twice on the home's front door. (ECF No. 41-13, Fryckland BWC 09:13:00-09:13:57.) Adamson opened the front door but kept the screen door shut. (ECF No. 41-13, Fryckland BWC 09:14:15- 09:14:24). Upon opening the door, Adamson first said "Oh my God, there's a f***ing guy right there." She then stated "hold on. My dog" before shutting and locking the door, while dogs are audibly barking in the background. (ECF No. 41-13, PageID.257.) Adamson returned and opened the door less than a minute after closing it.

Adamson was wearing a towel, and her hair was visibly wet. The officers and Adamson had a brief exchange before Officer Layne reached out his hand, as if to introduce himself. (ECF No. 41-13, Fryckland BWC 09:14:48.) After Adamson extended her right arm, Officer Layne grabbed it and attempted to pull her out of the home. (*Id.*) Adamson held the doorframe with her left arm. (*Id.* at 09:15:11-

09:15:15.)  Officer Amross then slapped Adamson in the face "as a distraction

technique" at which point Adamson let go of the doorframe.  (*Id*. at 09:15:17; ECF

No. 41-14, PageID.267.)  Officers simultaneously informed her she was under

arrest.  (ECF No. 41-13, Fryckland BWC 09:15:17.)  They then pull Adamson from

the house onto the front lawn.  (*Id*.)  While being dragged across the lawn by her

arm, Adamson states "[w]hat is wrong with you guys? I'm in my f***ing towel."

(*Id*. at 9:15:21.)  Adamson was then quickly handcuffed and restrained, while

officers kneeled on her back.  (*Id*. at 9:15:39.)  She was then left lying on the grass

for approximately five minutes and is seated in the police cruiser by 9:19:09.  By

the end of the arrest, Adamson's face is visibly bloody.  (*Id*.)

## II.    Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is

appropriate "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  The central inquiry is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-52 (1986).

The movant has the initial burden of showing "the absence of a genuine

issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once

the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

"[W]here, as here, there is 'a videotape capturing the events in question,' the court must 'view[ ] the facts in the light depicted by the videotape.'" *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012) (quoting *Scott v. Harris*, 550 U.S. 372, 378–81, (2007)).  Where photographic or video evidence has indications of being "doctored or altered in any way," or a non-movant provides evidence that "what [the video] depicts differs from what actually happened," then the normal summary-judgment framework may apply.  *See Scott*, 550 U.S. at 378.  However, when one party's version of the facts "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

## III.   Analysis

To determine if qualified immunity exists, "courts engage in a two-step inquiry: (1) whether the defendant violated a constitutional right, and (2) whether that right was clearly established." *Scozzari v. Miedzianowski*, 597 F. App'x 845,

8

847 (6th Cir. 2015). Once the defense is raised, it is the burden of the plaintiff to establish that the defendant is not entitled to qualified immunity. *Gavitt v. Born*, 835 F.3d 623, 641 (6th Cir. 2016). This analysis is applied to each of Adamson's claims against the defendant officers.

## IV. Search and Seizure (Count I)

The Fourth Amendment provides the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. Searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). As neither party's brief addresses the factual question of if the police entered Adamson's home to conduct her arrest, for the purposes of this opinion the Court assumes that the officers entered Adamson's home.[3]

### a. Constitutional Violation

"Even if police have probable cause to arrest a suspect, a warrant is required for police entry into the suspect's house unless there are exigent circumstances that excuse the warrant requirement." *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 996 (6th Cir. 1994). Exigent circumstances which allow police to conduct a warrantless entry include the "(1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of

---

[3] In any event, Adamson's front porch was within the curtilage of her home and thus entitled to Fourth Amendment protection. *Collins v. Virginia*, 584 U.S. 586, 593 (2018); *Florida v. Jardines*, 569 U.S. 1, 6 (2013).

danger to the police or others." *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir. 1996).  Defendants argue there were exigent circumstances based on hot pursuit and the risk of danger to police or others.

The "police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin*, 466 U.S. 740, 749–750 (1984).  The Sixth Circuit has held that "in a civil damage suit, whether exigent circumstances existed to excuse a warrantless arrest is a question for the jury provided that, given the evidence on the matter, there is room for a difference of opinion." *O'Brien*, 23 F.3d at 998.  Courts look "to the totality of circumstances" to determine if exigent circumstances are present. *Missouri v. McNeely*, 569 U.S. 141, 149 (2013) (citing *Brigham City v. Stuart*, 547 U.S. 398, 406 (2006)).

"[A]n important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." *Welsh*, 466 U.S. at 753.  However, "no exigency is created simply because there is probable cause to believe that a serious crime has been committed[.]" *Id.*

### i.  Hot Pursuit Exception

"For the hot pursuit exception to apply, there must be a 'pursuit,' meaning an officer begins to arrest a suspect in a public place and the suspect flees, and the flight must be 'hot,' such that the emergency nature of the situation requires

10

immediate police attention." *United States v. Burris*, No. 23-CR-66, 2024 WL

232116 at *2 (N.D. Ohio Jan. 22, 2024) (citing *Smith v. Stoneburner*, 716 F.3d 926,

931 (6th Cir. 2013)); *see also People v. Mann*, No. 242583, 2004 WL 94102 (Mich.

Ct. App. Jan. 20, 2004).

Defendants seem to conflate the emergency aid exception with that of hot

pursuit, stating "'[h]ot pursuit' simply requires an emergency situation requiring

immediate police action." (ECF No. 44, PageID.556.) This is not the case, as the

cases cited by Defendants make clear, "[u]nder the hot pursuit exception, an officer

may chase a suspect into a private home when the criminal has fled from a public

place." *Smith*, 716 F.3d at 931. "Pursuit is defined as an effort to catch and detain

an individual following an attempted arrest and subsequent escape." *Coffey v.

Carroll*, 933 F.3d 577, 586 (6th Cir. 2019).

Here, police first interacted with Adamson at her residence, not in a public

place. Consequently, there was no "pursuit" which could have been continued into

her residence. Furthermore, there was a significant amount of time between the

inciting incident, the assault, and the arrival of police at Adamson's home. This

rendered the "pursuit was lukewarm at best" by the time the officers arrived at

Adamson's home. *See Coffey* 933 F.3d at 587.

Ultimately, if the hot pursuit exception applied here, it would also apply in

almost every circumstance in which police have probable cause to make an arrest

and are searching for a suspect.  This would undercut Fourth Amendment

protection of the home from unreasonable searches and seizures by obviating the

warrant requirement.  As a result, the hot pursuit exception does not apply.  The

only remaining exigent circumstance is whether Adamson posed an imminent

threat which justified a warrantless entry into her home.  This is a harder question.

### ii.  Risk of Danger / Emergency Aid Exception

Though "'[o]fficers do not need ironclad proof of a likely serious, life-

threatening injury to invoke the emergency aid exception,' . . . they must have an

objectively reasonable basis for believing that 'a person within the house is in need

of immediate aid.'"  *Gradisher v. City of Akron*, 794 F.3d 574, 584 (6th Cir. 2015)

(quoting *Michigan v. Fisher*, 558 U.S. 45, 48 (2009)).  "If a reasonable jury ***could***

conclude that there were no exigent circumstances, then there was a constitutional

violation."  *Reed v. Campbell Cnty., Kentucky*, 80 F.4th 734, 743 (6th Cir. 2023)

(emphasis added).

In cases where the risk of danger exception applied, "credible and reliable

evidence established 'the potential for injury to the officers or others and the need

for swift action[.]'"  *Nelms v. Wellington Way Apartments, LLC*, 513 F. App'x 541,

546 (6th Cir. 2013) (*quoting United States v. Huffman*, 461 F.3d 777, 785 (6th Cir.

2006)).  "[G]eneric possibilities of danger cannot overcome the required

particularized showing of a risk of immediate harm." *Morgan v. Fairfield Cnty., Ohio*, 903 F.3d 553, 562 (6th Cir. 2018).

The Sixth Circuit has previously emphasized the important role of 911 calls in determining whether the emergency aid exception applies, stating "[t]he whole point of the 911 system is to provide people in need of emergency assistance an expeditious way to request it." *Johnson v. City of Memphis*, 617 F.3d 864, 870 (6th Cir. 2010) (citations omitted). "911 calls—while not determinative—are 'highly relevant' to the issue of exigency." *United States v. Goins*, No. 22-1201, 2022 WL 17078875 at *3 (6th Cir. Nov. 18, 2022) (citing *Smith v. City of Wyoming*, 821 F.3d 697, 712 (6th Cir. 2016)).

Furthermore, a "threat to the safety of a minor child within a home constitutes an exigent circumstance under at least some circumstances." *Smith*, 821 F.3d at 710 (finding no exigent circumstances where a mother was reportedly intoxicated and unable to care for her children, but responding officers did not treat the report as an emergency).

"The mere existence of firearms within a residence does not create an exigency, but indicia that such weapons might be used can support a finding of exigent circumstances." *Goins*, 2022 WL 17078875 at *3 (citing *Gradisher*, 794 F.3d at 584–85). The "presence of a weapon creates an exigent circumstance, provided the government is able to prove they possessed information that the

13

suspect was armed and likely to use a weapon or become violent." *United States v. Bates*, 84 F.3d 790, 795 (6th Cir. 1996). For example, in *United States v. Tatman*, 397 F. App'x 152 (6th Cir. 2010) the Sixth Circuit found that no exigent circumstances were present in a domestic violence case where the couple had been separated and, while there was evidence of a firearm in the home, there was no indication that it was likely to be used, and the alleged assailant was cooperative with law enforcement.

The critical factors in determining exigent circumstances are the stability of the situation and the need for officers to respond quickly. In *Williams v. Maurer*, 9 F.4th 416 (6th Cir. 2021), the court found that the question of exigent circumstances was one for the jury where the police arrived on the scene in response to an anonymous 911 call, the caller retracted her identification of the plaintiff's apartment, and there was insufficient corroboration that the apartment was the source of the disturbance. In *Thornton v. City of Columbus*, 727 F. App'x 829 (6th Cir. 2018), exigent circumstances were present when police responded to a call involving an unknown man threatening others with a firearm. When officers arrived at the scene, they were informed by at least one person present that the individual with the gun had run into the residence at issue. *Id.* at 835.

As previously stated, this is a close case. As explained by the officers, the exigent circumstance was the risk of injury to the child because Adamson was

14

allegedly high and possessed a firearm.  (ECF No. 41-12, PageID.267.)  At the time of the seizure, the officers were aware that: (1) Adamson had allegedly committed a felonious assault; (2) she was allegedly intoxicated; (3) there was a child in the residence; (4) she had a firearm in her possession; and (5) she had allegedly stolen a dog.  The fact that Adamson allegedly used a gun in commission of a felonious assault, a violent crime, suggests that she may use the firearm, which weighs in favor of a finding of exigent circumstances.

However, the Court also considers that there is no evidence that the officers were aware of a specific threat to the child, the scene was calm and quiet upon their arrival, and it is not clear that the officers were aware of the time that the assault had occurred.  Furthermore, the officers were not responding to the location of the assault and had no reason to believe that a crime was actively in progress or that there would be a victim at the scene.  This was not the case of officers responding to the location of an incident reported by a 911 call, as the Romulus police did.  There was no indication that Adamson fired the gun in the commission of the assault and there were no reports of shots fired.  Adamson voluntarily opened her door and engaged with police in what could be generally described as a calm and rational manner.

Defendants argue that the facts in this case are more exigent than those in *Thornton* or *Mann*.  The Court disagrees.  *Mann* is clearly distinguishable as no hot

pursuit occurred in this case.  Furthermore, unlike in *Thornton*, in this case the assault occurred at a separate address, which Adamson had already left.  The victim of the assault remained at that separate address.  There was no indication, once officers arrived at Adamson's house, that there was a disturbance or ongoing public emergency.  When Adamson opened the door, she was generally calm and, at worst, could be described as startled by the appearance of police.  There only evidence that Adamson posed a threat to her child was the fact she allegedly had a gun and was allegedly intoxicated.

The Court agrees that these elements could create a dangerous situation which could warrant a finding of exigent circumstances.  However, the Court finds that, viewing the facts in the light most favorable to Adamson, a reasonable jury could also find that exigent circumstances were not present and that there was sufficient time to obtain a warrant.  As the Court concludes that issues of fact remain as to whether the warrantless entry into Plaintiff's home was justified by exigent circumstances, it is a question for the jury and qualified immunity is inappropriate at this juncture.  *See Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998).  It remains only to consider whether the right was clearly established.

### b.  Clearly Established

In the Sixth Circuit, "it is 'clearly established' law that 'the fourth

amendment forbids the unannounced, forcible entry of a dwelling in the absence of

exigent circumstances.'" *Hall v. Shipley*, 932 F.2d 1147, 1151 (6th Cir. 1991)

(quoting *United States v. Francis*, 646 F.2d 251, 258 (6th Cir. 1981).  As recently

described by the Sixth Circuit in a similar context:

> Foundational principles of the Fourth Amendment establish that forced
> warrantless entry into an individual's home is presumptively unreasonable,
> and when an officer has no objectively reasonable basis for believing that
> the warrantless entry was supported by exigent circumstances, the officer is
> not entitled to qualified immunity.

*Reed*, 80 F.4th at 746.

If the jury finds that there were no exigent circumstances, then Defendants

violated clearly established law.  For the reasons stated, Defendants' motion for

summary judgment on the search and seizure claims is **DENIED**.

## V.    Excessive Force

Law enforcement officers violate the Fourth Amendment's protection

against unreasonable seizures by using excessive force "in the course of an arrest,

investigatory stop, or other seizure."  *Graham v. Connor*, 490 U.S. 386, 395

(1989).  Whether excessive forced was used is assessed under "an objective

reasonableness test, looking to the reasonableness of the force in light of the

totality of the circumstances confronting the defendants."  *Brown v. Lewis*, 779

F.3d 401, 418 (6th Cir. 2015) (quoting *Burgess v. Fischer*, 735 F.3d 462, 472 (6th

Cir. 2013)).  The assessment is made "without regard to [the officer's] underlying intent or motivation."  *Graham*, 490 U.S. at 397.  It is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and takes into account that police officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation."  *Id.* at 396-97.  "Each officer can be held liable only for his own wrongdoing" so each officer's actions are reviewed separately.  *Reed*, 80 F.4th at 748.

"Three important but non-exhaustive factors guide [the excessive force] analysis: 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'"  *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (quoting *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 687 (6th Cir. 2006)).  "Throughout the inquiry, [the court] must carefully balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'"  *Kent v. Oakland Cnty.*, 810 F.3d 384, 390 (6th Cir. 2016) (quoting *Graham*, 490 U.S. at 396).

Each segment of the event is reviewed in determining the reasonableness of an officer's actions, so the Court reviews the three events raised by Adamson as

constituting an excessive use of force as when: (1) Officer Layne pulled her out of the house; (2) Officer Amross slapped her in the face; (3) she was handcuffed and kneeled on while in a towel.

### a. Constitutional Violation

#### i. Officer Layne

Considering the *Graham* factors, a reasonable jury could conclude that Officer Layne used gratuitous force when he grabbed Adamson by the arm and attempted to pull her out of her home.  Here, the crime at issue was a felonious assault, which is a violent crime.  Furthermore, there was reason for the officers to believe that Adamson had a firearm somewhere in the residence.

However, there was no reasonable basis to believe that Adamson posed an imminent threat to the officers' safety at the time the alleged excessive use of force occurred.  Adamson voluntarily opened her door and engaged with officers while in a towel.  Adamson was coherent and generally cooperative with the officers and there is no indication that she has a weapon on her person.  Furthermore, Adamson was not told she was under arrest or asked to leave her home until after the force was used to remove her.

Finally, Adamson was not actively resisting at the time force was used.  Prior to Officer Layne's use of force, none of the officers requested that Adamson exit

her home. Furthermore, "withdrawal into the home does not constitute resistance." *Reed v. Campbell County, Kentucky*, 80 F.4th 734, 749 (6th Cir. 2023).

The circumstances of this case are similar to those in *Reed*. There, the Sixth Circuit found that summary judgment was inappropriate on a use of force claim where an officer pulled an individual out of his home in a warrantless arrest. *Id.* The court stated that a reasonable jury could conclude that the use of force was gratuitous, as the jury could find that the officers had no right to be in the plaintiff's home in the first place. *Id.* Although felonious assault is more serious than the obstruction charge at issue in *Reed*, the factors overall suggest that a jury could find that Officer Layne used gratuitous force.

Given the foregoing considerations, a reasonable jury could find that Officer Layne used gratuitous force when he grabbed Adamson by the arm and attempted to pull her out of her home after entering the home without exigent circumstances and without any basis to think that Adamson posed a threat to his or others' safety.

### ii. Officer Amross

Likewise, a reasonable jury could conclude that Officer Amross used gratuitous force when he slapped Adamson. As stated above, withdrawal into the home does not constitute active resistance. *Id.* Here, viewing the facts in the light most favorable to Adamson, her sole act of "resistance" was her attempt to retreat into her home. Furthermore, after she is brought onto the lawn, Adamson does not

appear to be physically struggling against the officers and her objections are
primarily verbal.

Defendants argue that Adamson admitted to resisting, however, her
deposition transcript specifically states that she resisted being pulled from the
house.  However, when asked about the time when she lying on the ground after
the officers requested her to put her hands behind her back, Adamson stated she
was not resisting or fighting back at that point.  (ECF No. 41-4, PageID.213.)

Viewing the evidence in the light most favorable to Adamson, she was not
actively resisting after she was removed from the doorway.  While in the doorway,
Adamson's sole resistance was to attempt to retreat into her home.  Consequently, a
reasonable jury could find that Officer Amross used gratuitous force by slapping
Adamson when she was not actively resisting and there was no indication that she
posed an imminent threat.

### iii.  Officers Fryckland, Lumetta, Struder, and Sylvester

Finally, a reasonable jury could also find that the remaining defendant
officers used gratuitous force when dragging Adamson across the lawn and
kneeling on her back.  As a result, qualified immunity is inappropriate on the
excessive force claim.  *See Sova*, 142 F.3d at 903.

Defendants argue that they are entitled to summary judgment as Adamson
has failed to "argue the liability of the individual officers."  (ECF No. 44, 557

(emphasis added).)  However, Adamson has identified which act is attributable to each officer when she states it was "Layne who pulled Veronica out of her home, Amross who struck her face, Fryckland, Lumetta, Struder, and Sylvester who dragged her off her porch, handcuffed her and left her fully exposed on her front Lawn[.] (ECF No. 43, PageID.335–36.)  She provided evidence to support this statement, including bodycam footage.  (See ECF No. 41-13, PageID.256; Fryckland BWC.)  Furthermore,

> where a plaintiff who was unable to identify clearly which officers committed specific acts during the incident produces evidence that places an individual defendant in a small group of officers that committed allegedly unconstitutional acts within each other's presence, the plaintiff's claim against that defendant may survive summary judgment.

*Fazica v. Jordan*, 926 F.3d 283, 292 (6th Cir. 2019).

In this case, the officers were all involved in the same incident and committed the allegedly unconstitutional acts within each other's presence.  For that reason, even though the actions attributable to Fryckland, Lumetta, Struder, and Sylvester are lumped together, Adamson has sufficiently identified the officers and their actions to overcome summary judgment as a reasonable jury could find that each of the defendant officers directly used excessive force against her or observed others doing so and failed to act.

**b.  Clearly Established**

22

"It is clearly established law that officers may not use gratuitous violence against individuals who are not actively resisting." *Reed*, 80 F.4th at 751. Importantly, "refusing to permit police officers to enter one's home or refusing to continue an interview with an officer outside of one's home also cannot constitute 'active resistance' sufficient to justify a use of force." *Reed,* 80 F.4th at 749.

As Adamson was not actively resisting either Layne or Amross at the time of their uses of force, her constitutional right to be free of gratuitous force was clearly established.  Likewise, it is possible that a jury could find that Adamson was not actively resisting Officers Fryckland, Lumetta, Struder, and Sylvester when she hesitates to put her hands behind her back while in her towel.  (ECF No. 41-13, Fryckland BWC 09:15:30.)   For those reasons, summary judgment on the excessive force claim is **DENIED**.

## VI.   Malicious Prosecution

To succeed on a malicious prosecution claim, the plaintiff must show: (1) criminal prosecution was instigated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; (2) lack of probable cause for the criminal prosecution; (3) that the plaintiff suffered a deprivation of liberty as a consequence of the legal proceeding; and (4) the criminal prosecution was resolved in the plaintiff's favor.  *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010).

Defendants argue that the malicious prosecution claim must be dismissed as Adamson has not established a deprivation of liberty distinct from her initial arrest and there was probable cause to arrest her for the felony charge in Romulus, to which she ultimately pleaded guilty.  (ECF No. 41-12, PageID.254.)  In response, Adamson argues that there was no probable cause for the resisting and obstructing misdemeanor charge, the initial seizure was from her home, and the seizure was prolonged as she sat unclothed in a squad car for over half an hour.  Adamson's malicious prosecution claim is based on the resisting and obstructing citation.

Adamson's malicious prosecution claim does not survive the first element. To be liable for malicious prosecution, the officers must have been involved in the decision to prosecute, beyond effectuating the initial arrest.  *Sykes*, 625 F.3d at 312–317.  For example, an officer may influence the decision to prosecute if she offers false testimony or falsifies investigation materials.  *Id.* at 314.

"To be liable for 'participating' in the decision to prosecute, the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating."  *Webb v. United States*, 789 F.3d 647, 660 (6th Cir. 2015) (quoting *Sykes*, 625 F.3d at 308 n.5.)  Furthermore, "[p]rosecution must have been a reasonably foreseeable consequence of the defendant's conduct, and the conduct must have actually influenced the decision to prosecute."  *Meeks v. City of Detroit*, 727 F. App'x 171, 178 (6th Cir. 2018).  In the case of a misdemeanor citation, a

24

court in this district has dismissed a malicious prosecution claim due to lack of involvement where the officer issued a citation for breach of the peace, but there was no indication that the officer had subsequent contact with the prosecutor which indicated he encouraged the pursuit of criminal charges. *Gerics v. Trevino*, No. 15-CV-12922, 2019 WL 2448324 (E.D. Mich. June 12, 2019).

Ultimately, there is no allegation or evidence presented that suggests that the officers influenced or were involved in the decision to prosecute, beyond the possible issuance of the initial citation. If anything, the record shows a lack of the officers' participation in the prosecution. For example, the officers were not present at the evidentiary hearing at which the charge was dismissed and the prosecutor stated that the officers were unavailable. (ECF No. 43-13, PageID.549.) There is also no evidence that any officer recklessly or knowingly made a false statement in issuing the citation. Consequently, no reasonable jury could find in Adamson's favor on the malicious prosecution claim and summary judgment in Defendants' favor is appropriate.[4]

---

[4] The Court further notes that to succeed on her malicious prosecution claim, Adamson must also show she "suffered a deprivation of liberty distinct in some respect from the deprivation of liberty associated with the valid charge." *Hinkel v. Westover*, 23-CV-00567, 2024 WL 3867524 at *6 (M.D. Tenn. Aug. 19, 2024); *see Chiaverini v. City of Napoleon*, 602 U.S. 556 (2024). In this case, the Romulus felony would be the valid charge as Adamson was subsequently convicted of it. The Court is skeptical that Adamson could show a deprivation of liberty which is distinct from the deprivation caused by the felony charge. *See, e.g., Staten v. City of Dickson*, No. 3:16-cv-00771, 2017 WL 4232677, at *4 (M.D. Tenn. Sept. 25, 2017); *Freeman v. Troutt*, No. 10-cv-0697, 2012 WL 5439160, at *9–10 (M.D. Tenn. Nov. 7, 2012). However, given the fact it is

For the foregoing reasons, summary judgment on the malicious prosecution claim is **GRANTED** and the malicious prosecution claim is **DISMISSED**.

## VII.   *Monell* **Liability**

A municipality is not liable for a civil rights violation simply due to an "injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). To prevail on a §1983 claim against a municipality, the plaintiff must show that the alleged federal violation occurred because of a municipal "policy" or "custom." *Monell*, 436 U.S. at 691. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citations omitted).  Further, the policy or custom must "be the moving force behind the violation of the plaintiff's constitutional rights." *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012) (citing *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254-55 (6th Cir. 2010)).

There are four recognized avenues for a plaintiff to establish a municipality's policy or custom: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal

---

clear the officers were not involved in the decision to prosecute, and that issue is dispositive, the Court makes no finding on the deprivation of liberty element.

actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess*, 735 F.3d at 478 (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).  Adamson alleges the City of Taylor had a policy of inadequate training or supervision.

To prevail "on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).  To show deliberate indifference, Plaintiff "must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)).

Adamson argues that this case and *Coffey* show a "systemic failure to adequately train or supervise its officers on the basic contours of the *Fourth Amendment*'s warrant requirement or 'exigent circumstance[.]'" (ECF No. 43, PageID.339.)  She provides no other evidence of inadequate training or supervision.

27

*Coffey* involved the application of the "hot pursuit" exception where the Sixth Circuit found that no hot pursuit was present as the officers were not pursuing Coffey from a public place. *Coffey*, 933 F.3d at 586.  *Coffey* is distinguishable from the instant case as the officers also argued they had been given permission to enter the home and the court found there was a material dispute of fact on that issue.  *Id.* at 585.

Merely citing to *Coffey* is insufficient to overcome summary judgment on this claim as Adamson provides no evidence which shows the city deliberately ignored a pattern of constitutional violations.  The two instances cited by Adamson occurred three years apart and have significant differences in their factual contours and the specific nature of the constitutional violation.  Furthermore, there is no information provided about TPD's training or policy between *Coffey* and the present case.

Ultimately, Adamson provides no evidence of inadequate training or supervision.  She does not make the connection between the violation committed by the defendant officers and a department failure to train their officers.  For the foregoing reasons, summary judgment on the *Monell* claim is **GRANTED**.

## VIII.   Conclusion

For the foregoing reasons, **IT IS ORDERED** that Defendant's motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**;

28

**IT IS FURTHER ORDERED** that summary judgment on the Fourth Amendment Unreasonable Search and Seizure claim (Count I) is **DENIED**;

**IT IS FURTHER ORDERED** that summary judgment on the Fourth Amendment Excessive Force claim (Count II) is **DENIED**;

**IT IS FURTHER ORDERED** that summary judgment is **GRANTED** as to the malicious prosecution claim (Count III) and Monell liability claim (Count IV) and these claims are **DISMISSED WITH PREJUDICE.**

**SO ORDERED.**

                                        s/ Linda V. Parker
                                        LINDA  V. PARKER
                                        U.S. DISTRICT JUDGE

Dated: March 31, 2025